RENDERED: JUNE 15, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

2015-SC-000178-DG

DATE 7/6/17 Kim Redmon, DC

KENTUCKY CATV ASSOCIATION, INC.                                    · APPELLANT
(D/B/A KENTUCKY CABLE
TELECOMMUNICATIONS ASSOCIATION,
INC.)

ON APPEAL FROM COURT OF APPEALS
V.                          CASE NO. 2013-CA-001112-MR
FRANKLIN CIRCUIT COURT NO. 11-CI-01418

CITY OF FLORENCE, KENTUCKY; CITY                           APPELLEES
OF WINCHESTER, KENTUCKY; CITY OF
GREENSBURG, KENTUCKY; CITY OF
MAYFIELD, KENTUCKY; KENTUCKY
LEAGUE OF CITIES, INC.; LORI HUDSON
FLANERY, IN HER OFFICIAL CAPACITY
AS SECRETARY OF THE FINANCE AND
ADMINISTRATION CABINET; AND
THOMAS B. MILLER, IN HIS OFFICIAL
CAPACITY AS COMMISSIONER OF THE
DEPARTMENT OF REVENUE

AND                          2015-SC-000181-DG

LORI HUDSON FLANERY, IN HER                               APPELLANTS
OFFICIAL CAPACITY AS SECRETARY OF
THE FINANCE AND ADMINISTRATION
CABINET, COMMONWEALTH OF
KENTUCKY; AND THOMAS B. MILLER,
IN HIS OFFICIAL CAPACITY AS
COMMISSIONER OF THE DEPARTMENT
OF REVENUE, FINANCE AND
ADMINISTRATION CABINET,
COMMONWEALTH OF KENTUCKY

V.

CITY OF FLORENCE, KENTUCKY; CITY                      APPELLEES
OF WINCHESTER, KENTUCKY; CITY OF
GREENSBURG, KENTUCKY; CITY OF
MAYFIELD, KENTUCKY; KENTUCKY
LEAGUE OF CITIES, INC.; AND
KENTUCKY CATV ASSOCIATION, INC.

## OPINION OF THE COURT BY JUSTICE KELLER

### AFFIRMING, VACATING, AND REMANDING

Lori Hudson Flanery, in her official capacity as Secretary of the Finance

and Administration Cabinet for the Commonwealth of Kentucky; Thomas B.

Miller, in his official capacity as Commissioner of the Department of Revenue

for the Commonwealth of Kentucky (Cabinet); and Kentucky CATV Association,

Inc. (KYCATV) appeal the decision of the Court of Appeals reversing the

Franklin Circuit Court's judgment in their favor and remanding with

instructions to grant judgment in favor of the City of Florence, Kentucky; City

of Winchester, Kentucky; City of Greensburg, Kentucky; City of Mayfield,

Kentucky; and Kentucky League of Cities, Inc. (Cities).  This Court granted

discretionary review, and for the reasons stated herein, we affirm the opinion of

the Court of Appeals, vacate the Franklin Circuit Court's judgment, and

remand for entry of summary judgment in favor of the Cities.

## I.    BACKGROUND.

In 2005, the General Assembly enacted the Multichannel Video

Programming and Communications Services Tax (the Telecom Tax).  Kentucky

2

Revised Statute (KRS) 136.600 *et seq*. While the Telecom Tax as a whole changes the way the Commonwealth taxes video telecommunications and programming providers, the subject of this litigation is one provision prohibiting "every political subdivision of the state" from collecting franchise fees or taxes on franchises subject to the Telecom Tax. KRS 136.660(1)(a)-(c) (Prohibition Provision). The Telecom Tax authority encompasses each of the Commonwealth's political subdivisions; however, we note that only the Cities are parties to this litigation.

The Telecom Tax assesses a tax on the gross revenues received by all multichannel video programming (MVP) and communications service providers, and is composed of excise taxes, sales taxes, and other similar taxes on the property of MVP service providers. MVP service is programming provided by a television broadcast station or similar entity and includes cable television services, satellite broadcast and wireless cable services, and internet protocol television.

The Telecom Tax imposes a 3% excise tax on all retail purchase of MVP services, as well as a 2.4% tax on the gross revenues received by all providers of MVP services, and a 1.3% tax on the gross revenues received by providers of communications services. KRS 136.604 and KRS 136.616. These provisions effectively impose a 5.4% tax on total charges for MVP services and a 4.3% tax on total charges for telecommunications services. Revenue collected under the Telecom Tax is then deposited into the General Fund.

Section 163 of the Kentucky Constitution provides that no utilities shall be permitted within a city or town without the consent of their legislative bodies. Section 164 of the Kentucky Constitution authorizes counties, cities, towns, taxing districts, and other municipalities to grant franchises, subject to a twenty-year limitation thereon. Historically, municipalities collected franchise fees as compensation for granting utilities use of municipal rights-of-way, pursuant to Sections 163 and 164. Cable companies were required to obtain the local government's permission to use roads and rights-of-way, and the municipalities granted them permission via permits, to which franchise fees applied.

As noted above, the Telecom Tax's Prohibition Provision prohibits local governments from levying or collecting franchise fees or taxes from MVP and communications providers. KRS 136.660(1)(a)-(c). To compensate local governments for this loss of revenue, the statute mandates that a portion of the funds generated by the Telecom Tax be disbursed to the municipalities as "monthly hold-harmless amounts," which are capped at a total of $36,408,000.00 annually. KRS 136.650(2)(c). The parties do not dispute that this amounts to only 83% of the $42,100,000.00 annually collected by the municipalities prior to the Telecom Tax.

In 2011, the Cities filed a petition for declaratory relief, alleging that the Telecom Tax violates their right to grant franchises and to collect franchise fees as provided in Sections 163 and 164 of the Kentucky Constitution. The Cabinet and KYCATV denied the Cities' allegations and all parties filed motions

4

for judgment on the pleadings. The circuit court granted the Cabinet's and KYCATV's motions and dismissed the petition, holding that the Telecom Tax does not violate Sections 163 and 164.[1] The Court of Appeals then vacated the circuit court's judgment and remanded, finding that the Telecom Tax's Prohibition Provision violates Sections 163 and 164, entitling the Cities to summary judgment.[2] We set forth additional facts as necessary below.

## II. STANDARD OF REVIEW.

This case concerns a matter of constitutional construction or interpretation, which we review *de novo*. *Greene v. Commonwealth*, 349 S.W.3d 892, 898 (Ky. 2011). In conducting that review, we must construe the constitutional provisions at issue in a manner that carries out the intent of the framers because "[t]he polestar in the construction of Constitutions is the intention of the makers and adopters." *Grantz v. Grauman*, 302 S.W.2d 364, 367 (Ky. 1957). We gather that intent "both from the letter and the spirit of the document." *Id.* The dissent states that the majority, by looking to the framers' intent, "dangerously teeter[s] on injecting our own policy preferences into the case before us—a task most aptly reserved for the legislative branch."

---

[1] The parties filed motions for judgment on the pleadings; however, they attached exhibits to their pleadings. Because the exhibits constituted matters outside the pleadings, and the court considered those exhibits in rendering its judgment, we treat the court's order as a summary judgment rather than a judgment on the pleadings. Kentucky Rule of Civil Procedure (CR) 12.03.

[2] The Court of Appeals's analysis was limited to the constitutionality of the Prohibition Provision; however, it held that "the Telecommunications Tax violates Kentucky Constitution Sections 163 and 164 by prohibiting appellants from assessing and collecting franchise fees." To the extent that the COA held that the Prohibition Provision was unconstitutionally void, we affirm. However, we do not hold that the Telecom Tax in its entirety is unconstitutionally void.

However, we are "simply doing what we are charged to do." *Jefferson Cnty. Bd. of Educ. v. Fell*, 391 S.W.3d 713, 727 (Ky. 2012). As this Court stated in *Fell*:

> Where the statute is ambiguous, the Court may properly resort to legislative history. [*MPM Financial Group, Inc. v. Morton*, 289 S.W.3d 193, 198 (Ky. 2009)]; *Fiscal Court of Jefferson Co. v. City of Louisville*, 559 S.W.2d 478, 480 (Ky. 1977) ("The report of legislative committees may give some clue. Prior drafts of the statute may show where meaning was intentionally changed. Bills presented but not passed may have some bearing. Words spoken in debate may be looked at to determine the intent of the legislature."). Often legislative history is referenced, even where a statute is unambiguous, simply to underscore the correctness of a particular construction. *See Stephenson v. Woodward*, 182 S.W.3d 162, 172 (Ky. 2005) (Resort to legislative history is unnecessary when the statute is "abundantly clear," but in case at bar "legislative history is enlightening and serves only to strengthen our foregoing conclusion.").

*Id.* at 719–20.

### III. ANALYSIS.

In asserting that the Telecom Tax's Prohibition Provision does not violate the Kentucky Constitution, Appellants make two main arguments: 1) Sections 163 and 164 neither explicitly nor implicitly provide municipalities the power to collect franchise fees; and 2) Section 181 grants the General Assembly the power to prohibit municipalities from collecting franchise fees.[3] We address each argument below.

### A. Kentucky Constitution Sections 163 and 164.

Section 163 of the Kentucky Constitution provides:

No street railway, gas, water, steam heating, telephone, or electric light company, within a city or town, shall be permitted or authorized to construct its tracks, lay its pipes or mains, or erect its poles, posts or other apparatus along, over, under or across the

---

[3] We note that the Cabinet does not join KYCATV in its Section 181 argument.

streets, alleys or public grounds of a city or town, without the consent of the proper legislative bodies or boards of such city or town being first obtained; but when charters have been heretofore granted conferring such rights, and work has in good faith been begun thereunder, the provisions of this section shall not apply.

Section 164 of the Kentucky Constitution provides:

No county, city, town, taxing district or other municipality shall be authorized or permitted to grant any franchise or privilege, or make any contract in reference thereto, for a term exceeding twenty years. Before granting such franchise or privilege for a term of years, such municipality shall first, after due advertisement, receive bids therefor publicly, and award the same to the highest and best bidder; but it shall have the right to reject any or all bids. This section shall not apply to a trunk railway.

The Appellants argue that neither section discusses a municipality's right to collect franchise fees and, as such, the Court of Appeals erred in implying that such a right exists. Rather, the Appellants contend that Section 163 only vests in municipalities the ability to control the original occupation of its public streets and rights-of-way and, similarly, Section 164 only vests in municipalities the ability to *grant* franchises to the highest and best bidder. The Court, having reviewed the Proceedings and Debates in the Constitutional Convention of 1890 (Debates), finds it abundantly clear that the framers of our Constitution intended that municipalities shall have both the power to grant franchises as well as the power to collect fees in exchange for granting those franchises.

Evident within the Debates concerning Sections 163 and 164[4] is the framers' desire to protect the citizens of a municipality from a city council

---

[4] During the Debates, within the Municipalities Committee, Sections 163 and 164 were titled "Section 14" and "Section 15," respectively.

infiltrated by business interests and whose objective is to profit, at the expense of the public, through perpetual monopolies and backroom dealings. This is precisely the notion that our predecessor Court captured in *Stites v. Norton* over one hundred years ago. 125 Ky. 672, 101 S.W. 1189 (1907). "The evident purpose of [Section 164] was to prevent councils of cities from giving away or selling at an inadequate price the rights and privileges belonging to the citizens, and compel the disposition of such valuable rights to be made publicly, to the end that the citizen might obtain the greatest price possible." *Id.* at 1190.

However, the framers' concern was not solely limited to those who would infiltrate the municipalities' city councils, it was also directed toward those who would infiltrate the General Assembly and, thereby, take from the citizens of municipalities not only control over their franchises but also the financial benefit such franchises would produce. *See* Debates, 2845. This proposition was evidenced by Mr. Young, Constitutional Convention Delegate from Louisville:

> If corporations are to be intrusted [sic] with such privileges [to operate a franchise], the local government ought to be alone intrusted [sic] with the right of determining where and how the streets or alleys of any city shall be used for any such purpose. I know in the city of Louisville it would have been of great importance to us if the Legislature had not been permitted to take this question up, and allow street-car lines through our city without the consent of the local government.

*Id.*

This dual intention is further illustrated by Mr. Bronston, Constitutional Convention Delegate from Henderson, while speaking about Section 163 and

8

asserting that the cities should have full control of the placement of telephone, electric light, and gas companies: "I cannot see how any gentleman on the floor could insist with sincerity and earnestness, that the city should not have control of its streets and alleys, which streets and alleys are constructed by taxation for the benefit of the city, and under its exclusive control." *Id.* at 2849. As Mr. Bronston stated, the guiding themes behind the enactment of Sections 163 and 164 were: 1) municipal control; and 2) municipal benefit via the sale of franchises. *Id.* Our predecessor Court echoed this notion in *Kentucky Utilities Company v. Board of Commissioners of City of Paris*:

> [T]he main purpose behind this section 164 was to insure that every so often the municipality should have the opportunity of revising the terms of the franchise which it had granted as to *rates*, quality, service, and the like, and to have the advantage of *obtaining from time to time for the franchise its value* which most likely would be enhanced by the growth of population and business.

254 Ky. 527, 71 S.W. 1024, 1028 (1933) (emphasis added).

A reading of the Debates makes clear that the municipality's twenty-year limitation in creating franchises emerged from the framers' dual concerns of control and public benefit. Ky. Const. § 164. Mr. Mackoy, Constitutional Convention Delegate from Covington, stated: "This method [of providing a set-year limitation] determines the actual value of the franchise, which ought to go to the public, to whom alone it is due, and still leaves profit on capital actually invested to the [franchise]." Debates, 2950.

Continuing in this vein, Mr. Young adamantly stated that the municipalities should receive the full return of their franchises: "The object of

[Section 164] is, that if there is a valuable franchise or privilege given, that the public shall get the benefit of it and that the profit from it shall go into the public treasury, and not into the pockets of individuals." *Id.* at 2952. When asked if the provision requiring the sale of franchises after twenty years would be more appropriate in a city ordinance than in the Constitution, Mr. Young's response was dispositive on the issue: "[I]n the Constitution, where, to be valid, the franchise has to be put up and sold, we are sure to get the money *in the city treasury, where it ought to go." Id.* (emphasis added).

The dissent states that "the clarity of the constitutional delegation ceases at the moment a locality awards a franchise" and "[t]he ability to assess recurrent franchise fees is not necessary to a city's ability to grant a franchise and it is certainly not indispensable." These statements ignore that portion of Section 164 that requires a city to "receive bids . . . publicly, and award the [franchise] to the highest and best bidder." If a city cannot charge a fee for a franchise, there is no purpose for "receiving bids." By granting cities the ability to enter into a franchise agreement, the Constitution afforded them the benefit of the full range of contract law. Inherent in contract law is the ability to contract for and receive consideration in exchange for performance of the contract, *i.e.*, granting the franchise. Thus, the assessment of a franchise fee is an indispensable part of granting a franchise. Furthermore, there is nothing in either Section 163 or 164 that requires the successful bidder to pay the franchise fee in a lump sum, or to prevent a city from collecting that fee over the life of the franchise.

10

While "the franchise inheres in the sovereignty of the state," it is only subject to the control of the General Assembly "save to the extent it has been delegated by the Constitution . . . ." *Kentucky Utils. Co.*, 71 S.W. at 1029. It is clear that the framers of our Constitution intended to delegate to municipalities: control over the placement of utilities within their public spaces and rights-of-way; and the right to reap the long-term profits of that control through consideration paid by private franchisees to the municipality, *i.e.*, franchise fees. The portion of the Telecom Tax prohibiting municipalities from levying franchise fees on MVP services, including fees intended as compensation for the use of the municipalities' rights-of-way, is contrary to Sections 163 and 164 of the Kentucky Constitution and is, thus, void as unconstitutional.

**B.     Kentucky Constitution Section 181.**

KYCATV argues that the historical power of the municipalities to collect franchise fees was a delegation of the General Assembly's authority granted in Section 181 of the Kentucky Constitution. Section 181 provides:

> The General Assembly shall not impose taxes for the purposes of any county, city, town or other municipal corporation, but may, by general laws, confer on the proper authorities thereof, respectively, the power to assess and collect such taxes. The General Assembly may, by general laws only, provide for the payment of license fees on franchises, stock used for breeding purposes, the various trades, occupations and professions, or a special or excise tax; and may, by general laws, delegate the power to counties, towns, cities and other municipal corporations, to impose and collect license fees on stock used for breeding purposes, on franchises, trades, occupations and professions. And the General Assembly may, by general laws only, authorize cities or towns of any class to provide for taxation for municipal purposes on personal property, tangible and intangible, based on income, licenses or franchises, in lieu of

11

an ad valorem tax thereon: Provided, Cities of the first class shall not be authorized to omit the imposition of an ad valorem tax on such property of any steam railroad, street railway, ferry, bridge, gas, water, heating, telephone, telegraph, electric light or electric power company.

KYCATV contends that, through enacting the Telecom Tax, the General Assembly "simply withdrew" its delegation of authority to municipalities to impose and collect "state-determined license fees on franchises." However, this contention paints too broad a stroke over the power to impose franchise fees in that it does not delineate between the power municipalities are granted in Sections 163 and 164, and what powers the municipalities may have delegated to them in Section 181.

During the Debates, the framers discussed Section 181[5] extensively. The framers were cognizant of the fact that Section 164 provides municipalities with the authority to receive consideration in the form of franchise fees on their franchises *in exchange for the use of their rights-of-way*, while Section 181 provides the General Assembly with the power to collect license fees on franchises *in exchange for the privilege of doing business within the Commonwealth.*

The framers provided in Section 181 that municipalities shall have the power to collect a license fee on a franchise for the privilege of doing business within their boundaries, subject to the delegation of the General Assembly. Debates, 2689. This created the possibility of dual taxation, which concerned some of the delegates, who worried that the taxation would become overly

---

[5] During the Debates, in the Revenue and Taxation Committee, Section 181 was titled, in part, both as "Section 15" and "Section 16".

burdensome to franchise operators. As a result, the framers initially included the language "and no double tax shall be imposed" within what would become Section 181. *Id.*

Opponents of the "no double tax" provision were specifically concerned that prohibiting such a double tax would leave the General Assembly unable to collect taxes on the subject matter found in Section 181, including franchises, due to the General Assembly also collecting *ad valorem* tax on all property within the Commonwealth. *Id.* Mr. Mackoy, Constitutional Convention Delegate from Covington, first voiced this concern: "In a case from Paducah to the Court of Appeals, it was held that no *ad valorem* tax could be imposed on the same property. That that would be double taxation; and it seems to me, while we have always authorized municipalities to collect these license fees, that care should be taken not to make the tax a double one . . . ." *Id.* Mr. Bronston, Constitutional Convention Delegate from Henderson, then replied, "This might, in one sense, result in double taxation; but it is in conformity with the system which Kentucky has had for one hundred years. There are a good many classes of property subjected to double taxation, because they are taxed *ad valorem*, and then by license." *Id.*

One framer was able to summarize the Committee's position before the "no double taxation" issue was ultimately resolved. Mr. Nunn, Constitutional Convention Delegate from Crittenden, stated:

> If the Convention will turn to [Section 174], you will see that all property in this State shall be assessed according to its value [i.e., *ad valorem* tax]. That is one assessment. The first part of this [Section 181] authorizes the Legislature to allow the State to put a tax upon the

13

different trades, professions and occupations in the State. The latter portion authorizes municipalities to impose a tax. Now, I will illustrate it by taking the case of a saloon in this city. Under [Section 174] that saloon would pay an *ad valorem* tax on the value of its property. Under the first part of this section it would pay a license fee to the State, and, under the latter part, it would pay a license fee to the city. Thus we have a treble tax. Now the latter part of this section says that no double tax shall be imposed. I would take that to imply that all three of these powers could not be exercised under this section with this limitation added to it; and for that reason, I think, it should be stricken out, and let the Legislature impose all these taxes upon the different trades or occupations in the state, if it is necessary.

*Id.* at 2694. The Committee then voted to accept the section with the "no double taxation" provision stricken from the final version of Section 181.

It is evident from the Debates that the founders did not intend for Section 181 to include franchise fees paid by private franchisees as consideration for the use of a municipality's rights-of-way. This is made evident by the fact that the founders delineated between a franchise fee and a license fee on franchises in Section 164 and Section 181, respectively.

The General Assembly may delegate to municipalities the authority to collect license fees on franchises, and it may withdraw that delegation, because the municipalities' power to collect license fees on franchises is derived solely from the General Assembly's delegation. However, the municipalities' power to collect franchise fees under Section 164 has been delegated by the Constitution—not by the General Assembly. To be certain, the founders enacted both Sections 164 and 181 with the knowledge that the former provided a constitutionally-granted power to the municipalities, while the latter provided a power to the General Assembly, which could be delegated to the municipalities.

14

The General Assembly cannot withdraw that which it did not and cannot delegate. Accordingly, we hold that the General Assembly did not have the power under Section 181 of the Kentucky Constitution to prohibit municipalities from collecting franchise fees in exchange for use of their rights-of-way, as that power was constitutionally granted in Sections 163 and 164.

**C.      Severance of the Telecom Tax's Prohibition Provision.**

In 1996, the federal government enacted legislation that prohibited local governments from collecting taxes on satellite providers of MVP. As a result, satellite providers of such programming were exempt from local franchise fees, while non-satellite providers of such programming remained liable for those fees. To alleviate this perceived inequity, the General Assembly enacted the Telecom Tax, imposing an "excise tax . . . on the retail purchase of [MVP] service provided to a person whose place of primary use is in this state." KRS 136.604. Furthermore, the General Assembly required the programming providers to collect the tax from the purchasers and to remit the proceeds, less compensation for collecting the tax, to the Commonwealth. KRS 136.606, 136.614, 136.620.

As we held above, the General Assembly cannot prohibit the Cities from collecting franchise fees from franchisees as consideration for the use of the Cities' rights-of-way. The Cities argue that the Prohibition Provision is the only portion of the Telecom Tax that is unconstitutional and that this portion may be severed from the remainder of the Telecom Tax. We agree. "Whenever a statute contains unobjectionable provisions separable from those found to be

15

unconstitutional, it is the duty of the court so to declare and to maintain the act insofar as it is valid. In that situation, a court should refrain from invalidating more of a statute than is necessary." 16 A Am. Jur. 2d *Constitutional Law*, § 199 (2012).

KRS 446.090 provides:

It shall be considered that it is the intent of the General Assembly, in enacting any statute, that if any part of the statute be held unconstitutional the remaining parts shall remain in force, unless the statute provides otherwise, or unless the remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the General Assembly would not have enacted the remaining parts without the unconstitutional part, or unless the remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the intent of the General Assembly.

Severing the Prohibition Provision does not render the remainder of the Telecom Tax incapable of being executed in accordance with the intent of the General Assembly. As we noted above, one of the reasons the General Assembly included the Prohibition Provision was to protect non-satellite program providers from being liable for collection and remittance of the Telecom Tax while simultaneously being liable for the franchise fee. The General Assembly addressed that concern in KRS 136.660(5), giving providers subject to the Telecom Tax a tax credit for any amounts paid by way of "franchise fee or tax." Thus, severing the Prohibition Provision does not do damage to one of the intended purposes of the Act: preventing double payment by non-satellite program providers. Additionally, the tax credit provided in the Telecom Tax accomplishes another one of the General Assembly's goals:

16

alleviating the perceived inequity among various types of program providers that was created by the federal legislation.[6]

In conclusion, we note that political subdivisions that are not within the purview of Sections 163 and 164 of the Kentucky Constitution remain bound by KRS 136.600, *et seq.* Furthermore, nothing in this opinion prevents municipalities from opting to forgo collecting a franchise fee in lieu of participating in the Telecom Tax scheme. Nor does anything in this opinion prevent the Commonwealth from collecting the taxes due under the remaining portions of the Telecom Tax. However, the Telecom Tax's Prohibition Provision, KRS 136.660(1)(a)-(c), is unconstitutionally void as applied to the Cities.

## CONCLUSION.

For the reasons stated above, we affirm the opinion of the Court of Appeals, vacate the Franklin Circuit Court's order, and remand this case to the Franklin Circuit Court to enter summary judgment in favor of the Cities consistent with this Opinion.

All sitting. Cunningham, Keller, VanMeter, Venters and Wright, JJ., concur. Minton, C.J. dissents by separate opinion in which Hughes, J. joins.

MINTON, C.J., DISSENTING: I respectfully dissent from today's decision striking down portions of the Telecom Tax because I believe the majority

---

[6] We note that the agreement between the city of Florence and TKR states: "So that no provider of multi-channel services . . . shall receive an unfair competitive advantage, Operator shall be entitled to relief from competition as follows. If a competing multi-channel service [ ] is available to 50% or greater of the City then: . . . 9. Operator shall have no greater responsibility to pay a franchise fee than Competitor." Thus, Appellants' concern that different MVP providers would pay unequal amounts appears unwarranted, at least as to the city of Florence.

17

reaches its result by engaging in an overly broad interpretation of implied local powers inconsistent with Sections 163 and 164 of the Kentucky Constitution. To me, the only power clearly conferred by our state constitution to localities in this field is the power to grant franchises themselves. I am satisfied that, characteristic of many other populist reforms in the 1891 Constitution, the document extended localities the ability to grant franchises to curb cronyism and corruption. But I must dissent from the majority's holding because the text of our constitution simply does not support the conclusion that these particular provisions cede to local government the absolute and exclusive power to levy franchise fees.

The majority states that we must "construe the constitutional provisions at issue in a manner that carries out the *intent of the framers* through a thorough analysis of both "the letter and the spirit of the law." *Grantz v. Grauman*, 302 S.W.2d 364, 367 (Ky. 1957). Then moving past the text of the constitutional provisions themselves, it draws excerpts from the Constitutional Debates to create the critical basis for its holding. Doing so, the majority declares that our framers clearly intended to limit this franchise-fee-levying power exclusively to local governments. The result of this imaginative reconstruction clouds the Constitution's text and fails to give effect to the plain language of the words ratified by the people of the Commonwealth. If our search for the spirit of the law includes extraneous material unrelated to uncovering the ordinary meaning of the law, we dangerously teeter on injecting our own policy preferences into the case before us—a task most aptly reserved

18

for the legislative branch. Only the text of the 1891 Constitution was ratified. And our textual tools of constitutional construction are perfectly capable of resolving this case without invalidating an otherwise properly enacted piece of legislation.

The issue in this case is, of course, whether Sections 163 and 164 of the Kentucky Constitution cede to municipalities the inalienable power to assess franchise fees or whether that power remains dormant with the General Assembly to use or delegate as it deems appropriate. I agree wholeheartedly with the majority's analysis of Section 163 that any company operating what is now considered a public utility may conduct its business—and occupy public rights-of-way in perpetuity—only with consent of local legislative bodies. I further agree with the notion that this provision represents a clear statement that under our current constitutional structure, the ability to grant franchises to public utility companies is solely a local prerogative; it is a power given to local governments that may not be usurped by the General Assembly. That is also the only local function clearly and plainly extended by the terms of the text. But the power to assess franchise fees, if there is one, must therefore necessarily be an implied power derivative of the locality's power to grant the franchise itself.

To me, construing Sections 163 and 164 to include this implied power defies our established norm of constitutional construction. As a general rule, "a city possesses only those powers *expressly granted* by the Constitution and statutes plus such powers as are *necessarily* implied or incident to the

19

expressly granted powers and which are *indispensable* to enable it to carry out its declared objects, purposes, and expressed powers." *City of Bowling Green v. T & E Elec. Contractors*, 602 S.W.2d 434, 435 (Ky. 1980) (emphasis added). And if there are any doubts as to the existence of a particular municipal power, such doubt is always resolved against its existence. *See City of Horse Cave v. Pierce*, 437 S.W.2d 185, 186 (Ky. 1969). It is clear that our law favors a presumption against implied powers to municipalities; all local powers are either (1) expressly delegated through the state constitution or by act of the General Assembly; or (2) both necessary *and* indispensable to enable it to carry out an already properly delegated power.

To me, the clarity of the constitutional delegation ceases at the moment a locality awards a franchise. Any implied powers beyond the grant itself are open to speculation. The ability to assess recurrent franchise fees is not necessary to a city's ability to grant a franchise and it is certainly not indispensable. But even if I could be persuaded that it makes sense to find this implied local delegation, our constitutional precedent constrains me, in questionable cases such as this, to resolve any ambiguities against local delegation. And moreover, we have previously held that the General Assembly still retains great control over the local franchise-granting process. While the city possesses the sole power to grant the actual franchise or not, the General Assembly may regulate nearly all of the terms of the deal.

In *Kentucky Utilities Co. v. Board of Com'rs of City of Paris*, we articulated that though localities are the sole governing body with the power to grant

20

franchises, the General Assembly may dictate *how* they exercise that power. 71 S.W.2d 1024 (Ky. 1933). This case upheld a 1926 law enacted by the General Assembly requiring municipalities to provide for a sale of a new franchise at least 18 months prior to the expiration of the current franchise and required the franchise to be awarded to the "highest and best bidder." *Id.* at 1026. Our predecessor court recognized that the power to grant a franchise is an act of sovereignty, traditionally reserved to the legislative body, but limited in this instance by the state constitution, which limits this legislative function by reserving the decision to grant franchises to local municipalities. *Id.* at 1026-27. *See also* McQuillin's Municipal Corporations § 1748 (2nd ed.).

The court then appropriately recognized the crucial question: how far have "the people by their Constitution...stripped from their legislature such power and given it to local bodies, here municipalities?" *Id.* at 1027. A fair reading of this case supports the proposition that Sections 163 and 164 only grant exclusive powers to determining who physically occupies its right-of-way. By upholding the 1926 statute, we unavoidably ruled that the General Assembly may still intervene in matters of franchise and may dictate *how* municipalities exercise this discretion by exercising a "dormant power" it always retained. Though the Telecom Tax certainly presents a different context, the legislature is still injecting itself into the franchise process and in a way not inconsistent with the stated terms of the constitutional text.

To resolve this case, all we must do is to simply apply a discerning eye to the words enshrined as Kentucky constitutional law. And those words

21

seemingly do not cede the taxing power of the Commonwealth to local governments as the majority declares. Because I believe the majority decision over-implies powers to localities in contrast to our stated method of constitutional construction, I must respectfully dissent.

Hughes, J. joins.

COUNSEL FOR KENTUCKY CATV ASSOCIATION, INC.:

Douglas Frank Brent
Timothy Joseph Eifler
Jackson W. White
Stoll Keenon Ogden PLLC

Eric S. Tresh
Maria M. Todorova
Sutherland Asbill & Brennan, LLP


COUNSEL FOR LORI HUDSON FLANERY, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE FINANCE AND ADMINISTRATION CABINET, COMMONWEALTH OF KENTUCKY; THOMAS B. MILLER, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE DEPARTMENT OF REVENUE, FINANCE AND ADMINISTRATION CABINET, COMMONWEALTH OF KENTUCKY:

Bethany Atkins Rice
Office of Legal Services for Revenue


COUNSEL FOR CITY OF FLORENCE, KENTUCKY; CITY OF WINCHESTER, KENTUCKY; CITY OF GREENSBURG, KENTUCKY; CITY OF MAYFIELD, KENTUCKY; AND KENTUCKY LEAGUE OF CITIES, INC.:

Barbara B. Edelman
David James Treacy
Haley Trogdlen McCauley
Dinsmore & Shohl LLP


COUNSEL FOR AMICUS CURIAE, CHARTER COMMUNICATIONS, INC.:

John Nalbandian
Taft Stettinius & Hollister, LLP

Gardner F. Gillespie
J. Aaron George
Sheppard Mullin Richter & Hampton LLP